**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHEDIRA D. WILSON,** ***as administratrix of the estate of Armada Edna Wilson, deceased*** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 26-551** |
| **CITY OF PHILADELPHIA, EMILY KLENK, DYLAN TROST** | : | |

# MEMORANDUM

**MURPHY, J.** **August 10, 2026**

There is no constitutional right to emergency services, nor any constitutional obligation to affirmatively protect people from private harms. But the state may be on the hook when it creates the danger in the first place. Shedira Wilson alleges that the government created a danger to her mother, Armada Wilson, when the two EMTs who responded to her medical emergency delayed and denied her treatment. Following Armada Wilson's death, her daughter brought civil rights claims against the two responding EMTs under 42 U.S.C. § 1983. Now, the EMTs move to dismiss Ms. Wilson's suit for failure to state a claim. To survive this motion, Ms. Wilson must satisfy the onerous four-part test of the state-danger doctrine. In part, Ms. Wilson must show that an affirmative act by the EMTs placed her mother in a worse position than if the state had never intervened at all. But on close inspection and comparison to Third Circuit precedent, Ms. Wilson's allegations do not demonstrate that the outcome for Armada Wilson would have been any different had the EMTs never shown up. Therefore, we grant defendants' motion to dismiss without prejudice.

## I. FACTUAL ALLEGATIONS

According to the allegations, which we must accept as true for these purposes, decedent Armada Wilson began to struggle with her breathing the morning of February 13, 2024. DI 1 at ¶¶ 1-4.[1] She asked her granddaughter, Nahijah Wilson, to call 911 for her. *Id.* at ¶ 30. At approximately 11:00 a.m., Nahijah Wilson placed her first 911 call. *Id.* at ¶ 31. Five minutes later, when no one arrived, she placed a second 911 call. *Id.* at ¶ 32. She placed her third and final call five minutes later. *Id.*

At approximately 11:20 a.m., twenty minutes after the first 911 call, two emergency medical technicians (EMTs) arrived. *Id.* at ¶ 34. But instead of driving up to the Wilsons' home on S. Hemberger Street, the two EMTs, defendants Emily Klenk and Dylan Trost, parked at the end of the block around the corner on Snyder Avenue. *Id.* Nahijah Wilson witnessed the two EMTs walking slowly down the block, "showing no signs of urgency," with no equipment other than a small transport chair. *Id.* at ¶¶ 34, 45. At the time the EMTs entered the Wilsons' home, Armada Wilson remained "awake, alert, and able to engage in conversation." *Id.* at ¶ 37. However, Ms. Klenk declined to ask questions about her condition or assess her vital signs. *Id.* at ¶ 38. Instead, she inquired about Armada Wilson's oxygen tank and the length of her oxygen cord. *Id.*

Ms. Klenk and Nahijah Wilson argued. *Id.* at ¶¶ 40-42. Nahijah Wilson repeatedly asked why the EMTs were not providing adequate care, and Ms. Klenk became angry and argumentative. *Id.* At this point, Armada Wilson stated she believed she was going to die if the EMTs did not get her appropriate medical care and pled with them to do so. *Id.* at ¶ 43. Then, at

[1] We adopt the sequential pagination supplied by the CM/ECF docketing system. Citations to the docket begin with "DI," followed by a page number and/or a numbered paragraph.

least ten minutes after arriving, Ms. Klenk and Mr. Trost began the process of transporting Armada Wilson to the ambulance. *Id.* at ¶ 45. They spent several minutes strapping her to the small chair they had brought, during which Ms. Wilson bled from her mouth, lost control of her urinary functions, and became unresponsive. *Id.* at ¶¶ 48-49. A nearby camera showed the EMTs moving her to the ambulance while she was strapped loosely into the chair with her leg visibly unsecured. *Id.* at ¶ 52.

Armada Wilson's daughter, Plaintiff Shedira Wilson, was not on the scene, but she placed her own 911 call at approximately 11:36 a.m. after receiving troubling updates from Nahijah Wilson. *Id.* at ¶¶ 55-56. By the time Shedira Wilson arrived at the scene at 11:45, the additional police and fire assistance she requested had already arrived. *Id.* at ¶ 57. Before first responders transported her mother to the hospital, Shedira Wilson saw two firemen provide CPR to her mother in the back of the ambulance. *Id.* at ¶ 59. At approximately 12:02 p.m., the ambulance left the scene and transported Armada Wilson to Jefferson Hospital, where medical staff informed Shedira Wilson that her mother was intubated, developed a collapsed lung and pneumothorax, and was in a coma. *Id.* at ¶¶ 60-61.

Ultimately, the Wilson family made the decision to stop lifesaving measures, and Armada Wilson was pronounced dead several days later on February 19, 2024. *Id.* at ¶ 62. Medical professionals determined that the cause of death was lack of oxygen to the brain, "caused only by the delay in Ms. Wilson receiving appropriate medical care." *Id.* at ¶ 63. Following the incident, Ms. Klenk and Mr. Trost authored an "incomplete, inaccurate, and intentionally deceptive" run report and filed a false police report accusing Nahijah Wilson of assault. *Id.* at ¶ 121(q-r).

## II. MOTION AT ISSUE

### a. Procedural History and Standard of Review

On January 28, 2026, Shedira Wilson filed suit against Ms. Klenk, Mr. Trost, the City of Philadelphia Regional Office of Emergency Medical Services, the Philadelphia Fire Department — EMS, and the City of Philadelphia. *Id.* at ¶¶ 8-22. She pled four claims: Count I, "Wrongful Death/Survival Act State Law Claims"; Count II, "Civil Rights — 42 U.S.C. 4 1983"; Count III, "Civil Rights"; and Count IV, "State Law Medical Negligence." *Id.* at 16, 18, 25, 29. The City filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on March 20, 2026. DI 12. We held oral argument on the defendants' motion on June 4, 2026. DI 22.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations, accepted as true, to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the plaintiff pleads facts allowing the court to reasonably infer that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. Plausibility requires that the plaintiff show "more than a sheer possibility that the defendant has acted unlawfully." *Id.* Mere legal conclusions or threadbare recitals of the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555.

### b. Narrowing of Issues and Parties

After the defendants filed their motion to dismiss, Ms. Wilson narrowed her claims and eliminated defendants. First, the parties stipulated to dismiss Count IV (*see* DI 14), and Ms. Wilson acknowledged at oral argument that Count I related only to damages and would rise or fall on the sufficiency of the civil rights claims in Counts II and III. DI 22 at 3. Second, and

further to Counts II and III, we do not see a difference between them — nor did Ms. Wilson clarify the difference — so we will treat them as a single cause of action under 42 U.S.C. § 1983. Specifically, Counts II and III assert a state-created danger claim under the Fourteenth Amendment.[2] Third, and as to the defendants, the parties stipulated to dismiss the Philadelphia Fire Department — EMS and the City of Philadelphia Regional Office of Emergency Medical Services without prejudice. DI 14.

We also dismiss the City of Philadelphia. As defendants correctly explain in their motion to dismiss, the City can be held liable only through a *Monell* claim, not under a theory of vicarious liability. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("Under § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions.") (citation modified).

Ms. Wilson acknowledged at oral argument that she is not pursuing a *Monell* claim. DI 22 at 5. However, even if she were attempting to, her complaint does not succeed. A *Monell* claim can proceed in two ways: a plaintiff may allege (1) "that an unconstitutional policy or custom of the municipality led to his or her injuries" or (2) "that [the injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citation modified).

Here, Ms. Wilson alleges the defendants failed "to properly hire, train, supervise, and/or monitor their EMTs and medical providers" and failed "to have proper policies and procedures regarding hiring, training, supervising, and/or monitoring emergency medical technicians and medical providers on the appropriate emergency response to individuals exhibiting serious

---

[2] Ms. Wilson originally included additional claims under the Eighth Amendment and the Pennsylvania Constitution as part of Counts II and III, but she acknowledged at oral argument that she is no longer pursuing liability under these theories. DI 22 at 3, 6; *see also* DI 14.

medical conditions such as Armada Wilson," thus "depriving [Armada Wilson] of her constitutional right." DI 1 at ¶ 111. However, Ms. Wilson's allegations merely state the basic elements of a *Monell* cause of action, which is insufficient. *See Wood v. Williams*, 568 F. App'x 100, 104 (3d Cir. 2014) ("Simply paraphrasing § 1983 does not meet Rule 8's pleading requirements because it fails to satisfy the rigorous standards of culpability and causation required to state a claim for municipal liability.") (citation modified). For example, she does not assert facts supporting the existence of an unconstitutional municipal policy or suggest how such an unconstitutional policy caused the deprivation of her rights. Nor does she allege facts in the alternative sufficient to show that the City's alleged inadequate training amounted to deliberate indifference. Nor does Ms. Wilson explain how the alleged incident is part of a city-wide pattern. *See Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.") (citation modified). While applying Rule 12(b)(6) to a *Monell* claim is far from an exact science, compared to other complaints we have allowed through to discovery, Ms. Wilson's allegations are threadbare. *See, e.g.*, *Hicks v. City of Philadelphia,* No. CV 22-977, 2023 WL 5278713, at *10 (E.D. Pa. Aug. 16, 2023) (finding Mr. Hicks's *Monell* claim could proceed into discovery after he cited, among other facts, newspaper articles, consent decrees, and monitoring reports detailing instances of police misconduct similar to those he alleged in his complaint). Thus, we dismiss the City of Philadelphia and evaluate Ms. Wilson's § 1983 claim only against Ms. Klenk and Mr. Trost.

## III. <u>ANALYSIS</u>

"The threshold issue in any Section 1983 lawsuit is whether the plaintiff has sufficiently alleged a deprivation of a constitutional right." *Rivas v. City of Passaic*, 365 F.3d 181, 193-94

(3d Cir. 2004). "Because Section 1983 does not create any substantive rights, the plaintiff must be able to point to an independent constitutional or statutory right." *Id.* Here, Ms. Wilson alleges that the defendants violated her due process rights guaranteed under the Fourteenth Amendment.

There is no Fourteenth Amendment due process right to emergency medical or rescue services. *DeShaney v. Winnebago Dep't of Social Services*, 489 U.S. 189, 196 (1989). *DeShaney* concerned the government's failure to remove a four-year-old boy from his abusive father's custody. *Id.* at 193. The Court explained that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. And following *DeShaney*, courts have repeatedly reaffirmed that "[s]tates are not constitutionally obligated to provide rescue services, nor are they constitutionally required to provide competent rescue services voluntarily undertaken." *Brown v. Commonwealth of Pennsylvania Dep't Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 483 (3d Cir. 2003).

The Third Circuit acknowledges two exceptions to this broad principle. *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 907 (3d Cir. 1997). The first — the "special relationship" exception — allows plaintiffs to recover where the state enters into a special relationship with a particular citizen, such as through incarceration or institutionalization, and "fails, under sufficiently culpable circumstances, to protect the health and safety of the citizen to whom it owes an affirmative duty." *Id.* (citation modified); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) ("The [DeShaney] Court found that the special relationship which would impose affirmative duties of care and protection on the state existed only in certain limited

circumstances, such as when the state takes a person into its custody and holds him there against his will.”). The second exception, the state-created danger doctrine, allows plaintiffs to recover if the state creates a danger to a particular citizen that did not previously exist, or if the state did something to render that citizen more vulnerable to an existing danger than he/she would have been had the state never intervened. *Cappel v. Aston Twp. Fire Dep’t*, 693 F. Supp. 3d 467, 474 (E.D. Pa. 2023). Ms. Wilson relies on the second exception, the state-created danger doctrine, to argue that the EMTs violated her mother’s rights under the Fourteenth Amendment. DI 1 at ¶¶ 89, 93.

The Third Circuit adopted the state-created danger doctrine as a viable mechanism for establishing a constitutional violation under § 1983 in *Kneipp v. Tedder*. *Kneipp*, 95 F.3d at 1201. And the Circuit later clarified the four-part test it endorsed in *Kneipp*. *Rivas*, 365 F.3d at 202 (Ambro, J., concurring) (outlining “substantial modifications” made to the state-created danger test since *Kneipp*). Here, Ms. Wilson must satisfy the following four elements:

(1) the harm ultimately caused was foreseeable and direct;
(2) a state actor acted with a degree of culpability that shocks the conscience;
(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant’s acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state’s actions, as opposed to a member of the public in general; and
(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (2006) (citation modified). The first and third elements are not contested here. Thus, to survive the City’s motion to dismiss, Ms. Wilson must plead facts tending to show that Defendants Klenk and Trost (1) acted with a degree of culpability that shocks the conscience and (2) that they affirmatively used their authority in such a way that they rendered Armada Wilson more vulnerable to danger than had they never intervened at all.

We conclude that Ms. Wilson has pled conduct that could reasonably be viewed as conscience-shocking. However, she has not plausibly alleged an affirmative act that placed her mother in more danger than if no EMTs ever showed up at all. Because the complaint does not adequately allege the fourth element of the test for state-create danger, we grant the motion to dismiss without prejudice.

**a. Ms. Wilson plausibly alleges the second element of the state-created danger test, conscience-shocking conduct.**

The second element of the state-created danger test requires that the government official's action be "so ill-conceived or malicious" that it "shocks the conscience." *Brown*, 318 F.3d at 480 (citation modified). The first four-part state-created danger test articulated in *Kneipp* required only that the government actor act with "willful disregard" for, or "deliberate indifference" toward, the plaintiff's safety. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (1995). But the Supreme Court recognized that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another," and so the inquiry into whether conduct shocks the conscience "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Cnty. of Sacramento v. Lewis*, 532 U.S. 833, 850 (1998).

Courts evaluate conscience-shocking conduct under one of three standards, "depend[ing] upon the circumstances of a particular case." *Cappel*, 693 F. Supp. 3d at 481 (quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005)). "In hyperpressurized environments requiring a snap judgment," the plaintiff must show intentional harm by the state official. *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017) (citation modified). Where the state official must act "in a matter of hours or minutes," the plaintiff must show that the state actor "disregard[ed] a great risk of serious harm." *Id.* (citation modified). And where the state official "has time to

make an unhurried judgment," a plaintiff need only demonstrate that the state official acted with "deliberate indifference." *Id.* (citation modified).

The Third Circuit held in *Brown v. Commonwealth of Pennsylvania Department of Health Emergency Medical Services Training Institute* that the second standard applies to emergency medical personnel, who "have little time for reflection, typically making decisions in haste and under pressure." 318 F.3d at 480; *see also Rivas*, 365 F.3d at 196. Likewise, we held in *Cappel v. Aston Township Fire Department* that a 911 call stating that a patient is struggling to breathe "evinces a level of medical immediacy" that precludes the EMTs from making an "unhurried judgment" — but also that such a call does not create the "highly pressurized" circumstances that require a plaintiff to show intentional harm. *Id. a*t 482. Thus, Ms. Wilson's allegations must plausibly demonstrate that the EMTs disregarded a great risk of serious harm to Armada Wilson. We conclude that they do.

Ms. Wilson relies on *Rivas v. City of Passaic* in asserting that the EMTs' failure of action was so outrageous that it shocks the contemporary conscience. DI 16-1 at 11. There, two EMTs responded to a call from Mr. Rivas's child reporting that Mr. Rivas had suffered a seizure. *Rivas*, 365 F.3d at 185. The EMTs claimed that Mr. Rivas then attacked them, but other evidence in the record suggested that Mr. Rivas simply walked towards the EMTs with his arms extended in front of him, causing the EMTs to panic. *Id.* at 196. Either way, the EMTs called for police backup, and when the police arrived, they restrained Mr. Rivas, and Mr. Rivas died a short time later. *Id.* at 184, 196. At summary judgment, the Third Circuit concluded that a reasonable jury could find that the EMTs "abdicate[d] their duty to render medical assistance" and consciously disregarded a great risk of serious harm to Mr. Rivas by falsely accusing him to the police of

acting violently and then abandoning him to law enforcement — particularly since EMTs are supposed to render aid to those in need of medical assistance. *Id*. at 196.

Conversely, Defendants rely on *Brown*, arguing that the EMTs' short delay arriving to the home and moving Armada Wilson to the ambulance, plus their failure to bring adequate equipment, amounts to "only run-of-the-mill medical negligence, if even that, that cannot rise to the necessary level of culpability." DI 12 at 8. *Brown* involved two EMTs who responded to a report of an infant choking on a grape. *Brown*, 318 F.3d at 475. The EMTs got lost on the way to the scene, delaying their arrival, and then made no attempt to dislodge the grape from the child's throat en route to the hospital. *Id.* at 481. The child died two days later. *Id.* at 476. The Third Circuit held that the parents' state-created danger claim failed because the EMTs' behavior did not shock the conscience, reasoning that the EMTs did not purposefully delay their rescue efforts or act "in an otherwise outrageous manner." *Id.* at 481. The Court concluded that "the record depicts EMTs who attempted to arrive at the scene of the incident as rapidly as they could." *Id.* Though the EMTs "ultimately failed" to save the infant, the court opined, "they had no constitutional obligation to do so." *Id.*

The determinative question here is whether the factual allegations more closely resemble *Brown* or *Rivas*. While the City's argument is well taken, we think several of the facts Ms. Wilson alleges suggest that defendants Ms. Klenk and Mr. Trost "abdicated their duty to render medical assistance," tipping the scale away from *Brown* and toward *Rivas*. *Rivas*, 365 F.3d at 196. According to the complaint, the EMTs walked slowly toward the home with no equipment other than a small chair, "showing no signs of urgency," even though they knew that Ms. Wilson was struggling to breathe. DI 1 at ¶ 34. Rather than evaluate Ms. Wilson, take vitals, or administer care, Ms. Klenk questioned her about her oxygen tank and cord. *Id.* at ¶ 38. The

EMTs did not assess Armada Wilson's vital signs until she pleaded with them to do so, stating that she believed she was going to die. *Id.* at ¶¶ 43-45. Instead, Ms. Klenk engaged Nahijah Wilson in an argument contentious enough that she filed a false police report accusing Nahijah Wilson of assault. *Id.* at ¶¶ 41, 121(q)-(r). When the EMTs finally began moving Ms. Wilson to the ambulance, they barely strapped her into the small chair, leaving her leg hanging off the side. *Id.* at ¶ 52. Thus, the record here does not depict a "failed rescue" despite a "concerted effort" by the defendants to reach the scene "as rapidly as they could." *See Brown*, 318 F.3d at 481. Several of the allegations — the EMTs' approaching the patient's home with no urgency, engaging the patient's granddaughter in an altercation, filing a false police report following the altercation, and transporting the patient without properly securing her leg — suggest the EMTs "purposely delay[ed] their rescue efforts" and "act[ed] in an otherwise outrageous manner." *Id.* For that reason, we conclude Ms. Wilson has plausibly alleged that the EMTs disregarded a great risk of serious harm to Ms. Wilson, satisfying the conscience-shocking conduct requirement of the state-created danger test.

**b. Ms. Wilson does not plausibly allege the fourth element of the state-created danger test, affirmatively creating the danger or making it worse.**

The fourth element of the state-created danger test itself contains three prongs; it requires that Ms. Wilson show (1) that "a state actor exercised his or her authority," (2) that "the state actor took an affirmative action," and (3) that "this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. *Ye v. U.S.*, 484 F.3d 634, 639 (3d Cir. 2007). Defendants focus their challenge on prongs two and three. DI 12 at 8-9. We agree that the factual allegations here are insufficient to satisfy these prongs. Therefore, Ms. Wilson's complaint does not state a claim under the state-created danger doctrine.

**i. Ms. Wilson does not plausibly allege that the EMTs took relevant affirmative acts.**

The Third Circuit is clear that "an alleged failure to *do something*, standing alone, cannot be the basis for a state-created danger claim." *Johnson v. City of Philadelphia*, 975 F.3d 394, 401 (3d Cir. 2020). Thus, it rejects "attempts to redefine clearly passive inaction as affirmative acts." *Morrow v. Balaski*, 719 F.3d 160, 178 (3d Cir. 2013). But the Circuit recognizes the ''inherent difficulty in drawing a line between an affirmative act and a failure to act,'' so the "dispositive factor" as to whether an affirmative act occurred is "whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 242 (3d Cir. 2016); *Morse*, 132 F.3d at 915.

The Third Circuit refers to an Eleventh Circuit case, *Mitchell v. Duval County School Board*, as illustrative of this principle. In *Mitchell*, the victim, a fourteen-year-old student, was waiting on a ride home from a school function. *Mitchell v. Duval Cnty. Sch. Bd.*, 107 F.3d 837, 838 (11th Cir. 1997). He tried to call his father from the school administration office, but school officials did not let him, so he called from an outdoor payphone. *Id.* While waiting for his father to arrive on a driveway outside the school, "non-student, third party assailants" shot and killed the student. *Id.* Because the school officials did not mandate that the victim wait exactly where he did — he could have chosen somewhere else inside the school, in the courtyard, or another place nearby — the Eleventh Circuit held that the plaintiff did not demonstrate "that the state affirmatively placed [the] decedent in a position of danger." *Id.* at 839.

The affirmative act analysis has evolved over time. *Cappel*, 693 F. Supp. 3d at 484. As "often times there is no clear line to draw" between action and omission, courts have "slightly reframed" the question, "where helpful," to evaluate the state actor's effect on the "status quo" of the scene. *L.R.*, 836 F.3d at 242; *Cappel*, 693 F. Supp. 3d at 484. Courts taking this approach

first establish the "setting or 'status quo' of the environment before the alleged act or omission," and then they ask "whether the state actor's exercise of authority resulted in a departure from that status quo." *Cappel*, 693 F. Supp. 3d at 484 (citing *L.R.*, 836 F.3d at 243). Ultimately, "the purpose of pinpointing an affirmative act is to distinguish where officials might have done more from cases where officials created the risk itself." *Id.* (citation modified).

Furthermore, following *Ye*, the Third Circuit imposes an additional requirement for an act to be affirmative for purposes of the state-created danger doctrine: the act "must amount to a restraint of personal liberty that is similar to incarceration."[3] *Mears v. Connolly*, 24 F.4th 880, 884 (3d Cir. 2022) (citation modified). For example, in *Mears*, a mother was visiting her son at the psychiatric hospital where he was an inpatient. *Id.* at 882. A nurse, knowing that the son had attacked another patient and was growing "progressively more psychotic," was supervising the mother's visit as required by the hospital. *Id.* at 884. However, the supervising nurse exited the room, leaving the mother locked in the room alone with her son. *Id.* at 885. The son attacked her, and she sustained severe, permanent injuries. *Id.* at 883. The Third Circuit held that, because the mother had relied on the expectation that the visit would be supervised — and because she was "not permitted" to leave the visiting room once inside — she was "robbed of the

[3] It is not perfectly clear whether the restraint of personal liberty requirement fits under prong two or three of the fourth element analysis. In *Ye*, the Third Circuit evaluated whether there was a restraint of personal liberty under the second prong, holding that an act is not affirmative for purposes of the state created danger doctrine unless it deprives an individual of the ability to act on his/her own behalf. *Ye*, 484 F.3d at 640-41. Here, we follow the Third Circuit's structure from *Ye*. However, the Third Circuit has seemingly structured its analysis differently in other cases. *See Mears*, 24 F.4th at 885. In *Mears*, it evaluated prongs two and three at the same time and in conjunction with the deprivation of liberty requirement. *Id.* The point at which we address the deprivation of liberty requirement does not alter the outcome of the case. The key point is that Ms. Wilson does not meet this "bedrock requirement" of the state-created danger doctrine, as we explain below. *Ye*, 484 F.3d at 641.

chance to decide whether to have an unsupervised visit or take extra precautions. And *that* is a plausible deprivation of liberty." *Id.* at 885.

In contrast, the Third Circuit pointed to an Eleventh Circuit case, *Wyke v. Polk County School Board*, to illustrate circumstances insufficient to establish a deprivation of liberty. *Ye*, 484 F.3d at 642 (citing *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560 (11th Cir. 1997)). *Wyke* addressed a student who attempted suicide twice on school property but was saved by a peer. *Wyke*, 129 F.3d at 563. When the peer's concerned mother called the school to report the incidents, the dean of students assured her that "he would take care of it," so she did not call the suicidal student's mother directly. *Id.* at 564. But the dean "did no more than read some Bible verses to Wyke, who committed suicide shortly thereafter." *Ye*, 484 F.3d at 642. The peer's mother testified that she would have called the decedent's mother directly had the dean not falsely assured her that "the problem would be dealt with." *Id.* Nonetheless, the Third Circuit held that the dean "did not, either by verbal or physical act, restrain [her] from picking up her telephone," so there was no deprivation of liberty triggering Fourteenth Amendment protection. *Id*. (citation modified).

With that background, Ms. Wilson argues the following actions and inactions violated her mother's Fourteenth Amendment rights:

(a) failing to promptly arrive to the home of decedent Armada Wilson;
(b) failing to take the proper route and/or be familiar with the location of the home so as to ensure the ambulance would be as close to the home as possible;
(c) failing to bring the ambulance to a location closest to the home;
(d) failing to recognize, communicate or understand the urgency of the situation prior to arrival at the home and to be prepared as a result;
(e) failing to acknowledge, understand or recognize the prior health issues of decedent Armada Wilson as provided to emergency services, and to take same into account when entering the home and assessing the situation, which Defendants utterly failed to attempt to assess at all;

(f) failing to have appropriate equipment with them either in the ambulance or brought with them into the home, included but not limited to diagnostic equipment such as pulse oximetry, blood pressure cuff, cardiac monitor, oxygen or glucometer;
(g) failing to make the immediate decision to urgently move her to the ambulance for prompt transport to a medical facility;
(h) If the decision was made that prompt transport was not needed, failing to provide timely and adequate medical care and treatment who was exhibiting signs of respiratory distress;
(i) failing to take timely action to properly assess decedent Armada Wilson's health and medical condition in order to treat same and prevent her condition from deteriorating;
(j) failing to act with urgency and promptness in light of the condition of decedent Armada Wilson immediately upon entering the home and thereafter;
(k) failing to take steps to evaluate or assess Ms. Wilson, formulate impressions, and/or provide treatment to decedent Armada Wilson upon entering the home and thereafter;
(l) failing to take steps to appropriately communicate with decedent's granddaughter, Nahijah Wilson, including deescalation of the situation, while instead inappropriately and unprofessionally confronting Nahijah Wilson in a combative, rude and dismissive matter while ignoring the health and safety of decedent Armana Wilson;
(m) failing to recognize upon entering the home that proper equipment and additional personnel was needed for the timely and safe transport of decedent Armada Wilson from the home, and thereafter failing to request assistance from any other EMTs, first responders, or city agency for same;
(n) failing to recognize upon entering the home that the situation required additional medical equipment and supplies not brought to the home, and failing to take steps to timely procure the needed medical equipment and supplies from the ambulance into the home;
(o) failing to have the appropriate equipment other than a stair chair available for use to transport decedent from her home into the ambulance;
(p) failing to recognize decedent's condition was deteriorating, and failing to provide necessary medical care and treatment which caused/permitted decedent to become unresponsive, suffer from cardiac arrest, and code at or around the time when transport from the home to the ambulance was finally initiated;
(q) authoring a report of the emergency response that was incomplete, inaccurate, and intentionally deceptive in order to protect the Defendant; the run report contradicts the timeline of events, including but not limited to blood pressure readings that are inconsistent with the timing of cardiac arrest, and claiming that the Defendants rendered CPR to Ms. Wilson when video evidence and direct witness observations will demonstrate otherwise;
(r) filing a false police report against decedent Armada Wilson's granddaughter, Nahijah Wilson, asserting assault against Defendant Klenk when no such assault took place; said report only being filed by Klenk in retaliation for being repeatedly questioned about the total lack of urgency in providing care.

DI 1 at ¶ 104. Of the 18 allegations listed, 15 are *failures* of action. The EMTs' alleged failures to park close to the home, to bring appropriate equipment, to walk with urgency, to recognize

that Ms. Wilson's condition was deteriorating, to take vitals, and so on did not cause or exacerbate Ms. Wilson's illness — rather, they describe instances where Ms. Klenk and Mr. Trost "might have done more." *Morrow*, 719 F.3d at 186 (Ambro, J., concurring). And "an alleged failure to *do something*, standing alone" is not sufficient to make out an affirmative act. *Johnson*, 975 F.3d at 401.

Ms. Wilson comes closer to alleging an affirmative act with the remaining three allegations. The first and second remaining acts — filing an inaccurate run report and a false police report against Nahijah Wilson — are not mere failures of action. "Had [Defendants Klenk and Trost] merely *failed* to do something, they would not have written the report[s] at all." *Cappel,* 693 F. Supp. 3d at 485 (determining that filing a deceptive run report is an affirmative act). However, these two acts did not deprive Armada Wilson of her liberty. The complaint does not suggest that the inaccurate run report or false police report constrained Armada Wilson or her family members from acting on her behalf at any point. The reports did not prevent Ms. Wilson from refusing the EMTs' care or from picking up her telephone to call for help. Therefore, they do not qualify as affirmative acts within the meaning of *Ye* and do not satisfy the second prong of the fourth state-created danger requirement.

The final remaining allegation (o) — moving Armada Wilson in the small transport chair — is also not a mere failure of action. DI 1 at ¶¶ 49, 104(o). Placing Armada Wilson in the chair, strapping her in, and carrying her to the ambulance is "not a failure to do anything; it is undoubtedly an act." *Cappel*, 693 F. Supp. 3d at 484 (explaining that waving off an advanced life support unit is an affirmative act). And it changed the status quo at the scene — at first, Armada Wilson was in her home, and then she was in the ambulance. *Id.* (holding that a change in the status quo occurred where an advanced life support unit sat outside the patient's home for

3½ minutes, and then the unit left the home after the EMTs waved them off). Given her fragile condition, transporting Armada Wilson unsecured in a small chair across multiple city blocks undeniably placed her in a "dangerous position that was foreseeable." *Morse*, 132 F.3d at 915.

However, moving Armada Wilson in the chair was not a plausible deprivation of liberty and thus does not trigger Fourteenth Amendment protection. *DeShaney*, 489 U.S. at 200. By moving Armada Wilson to the ambulance, the EMTs did not physically or verbally prevent any member of the Wilson family from seeking alternative treatment. Defendants Ms. Klenk and Mr. Trost did not forcibly restrain Ms. Wilson in the chair, nor did they separate her from any "private source of protection." *Cappel*, 693 F. Supp. 3d at 487 (citing *Kneipp*, 95 F.3d at 1210). And the EMTs did not restrain Shedira Wilson from taking some other course of action, such as picking up her telephone to request alternative assistance. Indeed, Shedira Wilson succeeded in securing alternative care: fire and police personnel responded to the scene and performed CPR on Armada Wilson in the back of the ambulance. DI 1 at ¶¶ 58-59. To hold that Ms. Wilson satisfies the affirmative act requirement without her showing that the state restrained her liberty would contravene the Supreme Court's holding in *DeShaney* that the government's affirmative duty to protect under the Fourteenth Amendment arises from "the limitations which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 190; *see Ye*, 484 F.3d at 642 (holding that "merely alleging state actions which render the individual more vulnerable to harm" absent a deprivation of liberty by the government "cannot be used as an end run around *DeShaney's* core holding"). Therefore, we conclude that Ms. Wilson has not alleged an affirmative act as defined by the state-created danger doctrine.

**ii. The EMTs' did not render Armada Wilson more vulnerable to danger than had the EMTs never arrived.**

Finally, even if Ms. Wilson had alleged affirmative acts for purposes of the state-created danger doctrine, no act by the EMTs rendered her mother more vulnerable to danger than she would have been in had the EMTs never arrived. According to the Third Circuit, "liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." *Morrow*, 719 F.3d at 177. For liability to attach, the state must place the victim in a worse position than had no state actor ever intervened at all. *Cappel*, F. Supp. 3d at 480. Courts often draw on *Bowers v. DeVito*, a Seventh Circuit case, in illustrating the appropriate benchmark:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982); *see Mark*, 52 F.3d at 1151.

*Kneipp* exemplifies a factual scenario where state officials enhanced a danger to the victim akin to throwing them into a "snake pit." *See Kneipp*, 95 F.3d at 1207. There, police confronted a visibly intoxicated woman staggering along the side of the highway with her husband. *Id.* at 1201. The officers stopped the couple just a third of a block from their home and quickly separated them for questioning. *Id.* Police let the husband go home, but did not release the wife, leading the husband to believe that "the police officers were going to take her either to the hospital or the police station." *Id.* at 1202. Instead, they left the wife to walk home alone, and police found her unconscious at the bottom of an embankment the next morning. *Id.* at 1203. The Third Circuit concluded that "[i]t is conceivable that, but for the intervention of the police, [the husband] would have continued to escort his wife back to their apartment where she

would have been safe." *Id.* at 1209. Thus, it held a reasonable jury could conclude the officers' actions "greatly increased" the danger to the woman. *Id.*

Here, no action or inaction by the EMTs rendered Armada Wilson more vulnerable to danger than if the EMTs had never arrived. Though the EMTs' arrival was allegedly delayed, and they failed to act with urgency to address Armada Wilson's declining condition, they had no constitutional obligation to rescue her, and no fact here suggests that the EMTs set Armada Wilson's initial illness in motion or exacerbated the preexisting danger to her. By all accounts, Armada Wilson was already rapidly declining leading up to and immediately after the EMTs' arrival. DI 1 at ¶¶ 30, 40. And according to the allegations, hospital staff determined that Armada Wilson's death was "caused *only* by the delay in Ms. Wilson receiving appropriate medical care." DI 1 at ¶ 63 (emphasis added). Presumably, if the EMTs had never showed up, the delay in Ms. Wilson's receiving care would only have lengthened. Further, the allegation that comes closest to an affirmative act — moving Armada Wilson in a small chair to the ambulance without properly securing her — also did not place her in a worse position than if the state had not acted at all. Although Armada Wilson's rapid decline occurred at the same time as the EMTs strapped her into the chair, Ms. Wilson does not allege that the EMTs' affirmatively placing or moving her mother in the chair exacerbated her mother's condition or "greatly increased" the danger Armada Wilson faced. *Kneipp*, 95 F.3d at 1209. Rather, Ms. Wilson alleges that the EMTs wasted "critical[]" time strapping Armada Wilson into the chair, allowing her condition to worsen until she became unresponsive. DI 1 at ¶ 49. Again, as the complaint lays out the facts, had the EMTs never moved Armada Wilson or transported her to the ambulance at all, the outcome would not have been any different.

Thus, the crux of Ms. Wilson's complaint is not that the state threw Ms. Wilson into the "snake pit," but that it failed to rescue her from it when she called. But the state is not constitutionally required to provide rescue services at all, much less competent rescue services voluntarily undertaken. *Brown*, 318 F.3d at 483. As a result, Ms. Wilson's state-created danger claim also fails on prong three of element four.

## IV. CONCLUSION

For the reasons explained above, the defendants' motion to dismiss is granted and plaintiff's claims are dismissed without prejudice. As provided by the accompanying order, plaintiff has 14 days to replead her claims, if she is able and should she choose to do so, in a manner that complies with the applicable laws.